GSI LUMONICS, INC., a Canadian
Corporation, Plaintiff,

v.

BIODISCOVERY, INC., a California
corporation, and Soheil Shams,
an individual, Defendants.

No. Civ.A. 99–12544–WGY.

United States District Court,
D. Massachusetts.

Aug. 25, 2000.

Daniel J. Lyne, Sharon H. Patton, Hanify & King, P.C., Boston, MA, Kathleen E. Cross, Hanify & King, Boston, MA, for plaintiff.

Steven Brower, Ginsburg, Stephan, Oringher & Richman, Costa Mesa, CA, Joseph J. Laferrera, Lucash, Gesmer & Updegrove, LLP, Boston, MA, Keyvan Samini, Stephan, Oringer, Richman & Theodora, Costa Mesa, CA, for defendants.

## *MEMORANDUM*

YOUNG, Chief Judge.

## I. INTRODUCTION

This case involves a copyright dispute related to computer software between declaratory judgment plaintiff GSI Lumonics, Inc. ("GSLI"[1]), a Canadian corporation, and defendants BioDiscovery, Inc. ("BioDiscovery"), a California corporation, and Soheil Shams ("Shams"), a resident of California. This Memorandum relates only to the Defendants' motion to dismiss Soheil Shams for lack of personal jurisdiction and his argument for dismissal based on the identity of the real party in interest, those issues having been taken under advisement at the oral hearing on February 16, 2000,[2] and having been ruled on by this Court by Order of March 6, 2000.

---

1. This nomenclature conforms to that of the parties'.

2. GSLI's cross-motion to stay a pending action in the Central District of California was denied at the oral hearing.

## II. FACTUAL BACKGROUND

The following facts are derived from the First Amended Complaint, unless otherwise indicated. GSLI is a Canadian corporation whose Life Sciences Division has a principal place of business in Watertown, Massachusetts.[3] GSLI designs and manufactures equipment for use in acquiring and analyzing human gene expression data from biological micro array slides. BioDiscovery, Inc., is a California corporation with a principal place of business in Los Angeles. In January 1998, GSLI and Shams (who at the time was allegedly conducting business under the name "BioDiscovery") entered into a Confidentiality Agreement (the "Confidentiality Agreement") pursuant to which GSLI was provided with a pre-release copy of ImaGene, a micro array software program, for GSLI's review in anticipation of entering a non-exclusive distribution agreement allowing GSLI to bundle ImaGene with its ScanArray scanners. GSLI did not receive the source code[4] for the ImaGene software. In March 1998, GSLI and BioDiscovery entered into such an agreement (the "OEM/Remarketing Agreement"). By the terms of the OEM/Remarketing Agreement, GSLI was free to market other image processing software and data extraction software.

In the summer of 1998, GSLI claims that it decided to develop its own micro array analysis software due to customer dissatisfaction with ImaGene and other shortcomings of the ImaGene software. In August 1999, GSLI introduced its own micro array analysis software, called "QuantArray." Due to its apparent superiority to ImaGene, QuantArray has become the leading micro array software in the market.

On October 25, 1999, BioDiscovery's counsel served notice, via letter, upon GSLI that "BioDiscovery, Inc." deemed QuantArray to infringe upon BioDiscovery's registered copyright. Since that date, GSLI met with Shams and representatives of BioDiscovery and attempted to determine the specifics of the copyright infringement allegations. Apparently Shams and BioDiscovery have not been forthcoming with any specific theory behind their copyright concerns. In an attempt to preserve its reputation against what it believes are unfair and untrue accusations of copyright infringement, GSLI filed this suit seeking declaratory relief of non-infringement on December 10, 1999 (the "Massachusetts Action"). On December 20, 1999, Shams filed suit in the Central District of California (the "California Action") against GSLI for copyright infringement, breach of the Confidentiality Agreement, and related causes of action. *See* Def.Mem. at 6.

## III. ANALYSIS

BioDiscovery and Shams have brought this Motion to Dismiss on the basis that the original defendant, BioDiscovery, is not the real party in interest, and that Shams, the real party in interest, filed his California action before he was amended into the Massachusetts Action by GSLI. Furthermore, Shams alleges that this Court lacks personal jurisdiction over him.[5]

### A. *Motion to Dismiss in Favor of the California Action*

██ BioDiscovery and Shams allege in their motion that BioDiscovery is neither the actual nor beneficial owner of the copy-

3. The Life Sciences Division had previously been an independent corporation and was purchased by the Canadian company after the parties had begun their relationship.

4. The source code consists of written computer-language instructions, used to create the program, which are not visible once the pro-

gram is "compiled" and released for distribution.

5. Shams has not waived his challenge to personal jurisdiction by appearing for this motion. He indicates in his motion that he is making a special appearance solely to bring the Motion to Dismiss. *See* Def.Mot. at 1 n. 1.

right in suit, and that Shams is the true owner.[6]  *See* Def.Mot. at 1–2.  GSLI does not now dispute the ownership of the copyright, but the circumstances explain GSLI's confusion as to ownership.  These circumstances show that GSLI either was actively misled into believing that BioDiscovery was the owner of the copyright in suit, or at least had a reasonable basis for believing that BioDiscovery was the owner.

### 1.  Basis for Confusion

At the time GSLI and Shams entered into the Confidentiality Agreement on January 30, 1998, BioDiscovery was not yet in existence but Shams was personally and individually using the name "BioDiscovery" as a "fictitious business name."  Def. Mot. at 3. At no point during negotiations did "BioDiscovery" reveal that the contract really involved intellectual property belonging to Shams.  *See* Pl.Opp. at 9. "BioDiscovery" is the name that appears on the Confidentiality Agreement.  *See* Shams Decl.Ex. B. The Confidentiality Agreement states, "BioDiscovery claims and reserves all rights and benefits afforded under federal and international copyright law in all software programs and documentation included in the materials as copyrighted works."  *Id.* This Confidentiality Agreement was not signed by Shams, but rather was signed by Nick Maverick, BioDiscovery's Director of Sales and Marketing.  *See id.*

Furthermore, the subsequent OEM/Remarketing Agreement uses the incorporated "BioDiscovery, Inc." name as the party to be bound by the agreement.  *See* Shams Decl.Ex. C. Shams negotiated that Agreement, but the language of the Agreement purports to grant a license from "BioDiscovery, Inc." to GSLI (then named "General Scanning, Inc."). Shams is not mentioned in the OEM/Remarketing Agreement.  The OEM/Remarketing

Agreement says that BioDiscovery holds GSLI harmless from any claims that the computer program to be distributed infringes any "patent, trademark, [or] copyright."  *Id.* at ¶ 14.1.  Additionally, the shrink-wrap license covering each copy of ImaGene to be distributed clearly specifies "BioDiscovery, Inc." as the sole licensor.  *See* Dowd Aff.Ex. 6. The ImaGene user manual stated on the lower-left hand corner, "Copyright (c) 1998, BioDiscovery, Inc." *Id.* Ex. 7. Additionally, screen pictures of the ImaGene software contained in the user manual clearly show a copyright notice, "Copyright BioDiscovery 1997, 1998." *Id.*

The October 1999 letter accusing GSLI of copyright infringement states, "It is the position of BioDiscovery that ... your organization engaged in intentional and illegal copying ... in contravention of BioDiscovery's registered copyright and written agreements between the parties."  Lyne Aff.Ex. A at 2. As before, the existence of Shams' interest in the copyright was absent from the communication.

It is quite clear to this Court that GSLI's failure to include Shams as a defendant in its original Complaint stems from a pervasive pattern of BioDiscovery's appearance as being the owner and party-in-interest of the copyright at issue, even prior to its own incorporation.[7]  Whether or not this concealment of the ownership interest was intentional, GSLI's intent to sue the copyright holder of ImaGene for a declaratory judgment is evident and it should not be prejudiced by its reliance on the defendants' ongoing, pervasive representations of ownership.

### 2.  Status of BioDiscovery

It is now clear to this Court that BioDiscovery is neither the owner nor the assignee of the copyright in suit.  Thus, argue

---

6.  The copyright was registered in 1998 as No. Tx–4–876–396.

7.  Furthermore, a typographical error in the purported registration number of the copy-

right hindered GSLI's ability to confirm the ownership of the copyright with the Copyright Office.  *See* Lyne Aff. ¶ 13.

the defendants, in a direct copyright infringement suit, BioDiscovery would have no standing to sue GSLI. Likewise, a declaratory judgment action against BioDiscovery fails for want of an "actual case or controversy." *See Starter Corp. v. Converse, Inc.,* 84 F.3d 592, 595 (2d Cir.1996). In copyright law, an action for infringement is brought by the legal or beneficial owner of the copyright at issue. *See* 17 U.S.C. § 501(b). GSLI has not argued in its brief that there is any reason to keep BioDiscovery in the case. Although BioDiscovery is likely to be joined in this action when Shams' claims of a breach of the Confidentiality Agreement are raised,[8] BioDiscovery's participation in the copyright suit is apparently superfluous. Logically, BioDiscovery ought be dismissed from the case.

### 3. Status of Shams

Shams argues repeatedly throughout his motion papers that he is entitled to dismissal because he filed his infringement action in California *first,* in advance of GSLI's suit against him here. The theory behind that argument, of course, is that GSLI failed to sue him—GSLI mistakenly sued BioDiscovery instead. Because the suit against BioDiscovery failed to establish an actual case or controversy, GSLI's suit was moot and cannot be said to have been filed before Shams' California Action.

Shams' conclusion is incorrect. By virtue of Fed.R.Civ.P. 15(a), a plaintiff is entitled as matter of right to amend its complaint without permission of the court if it does so before a responsive pleading has been served or within twenty days after the service of the pleading to be amended. GSLI amended its complaint to add Shams under this provision and did so twelve days after its initial filing. There was no responsive pleading from BioDiscovery prior to that amendment.

When a new defendant is added to the litigation through the vehicle of Rule 15(a),

a question arises about whether that amendment "relates back" to the date of the filing of the original complaint or whether the date of the amendment applies. Although this issue normally concerns a determination relating to a statute of limitations, the analysis is useful here to determine whether GSLI's Massachusetts Action was, by operation of law, "filed first" with respect to defendant Shams. Rule 15(c) governs the relation-back analysis when a party is subsequently added to the action by amendment of a pleading:

> (c) Relation Back of Amendments. An amendment of a pleading relates back to the date of the original pleading when
>
> (1) relation back is permitted by the law that provides the statute of limitations applicable to the action, or
>
> (2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, or
>
> (3) the amendment changes the party or the naming of the party against whom a claim is asserted if the foregoing provision (2) is satisfied and, within the period provided by Rule 4(m) for service of the summons and complaint, the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

Fed.R.Civ.P. 15(c).

Here, the claim asserted against Shams arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, and Shams

---

8. As this memorandum discusses later, such claims are compulsory counterclaims which Shams must raise or waive in this action. Therefore BioDiscovery, Inc. may be joined once again when those claims are brought.

had, within the time provided by Rule 4(m), received notice of the institution of the action such that he will not be prejudiced in defending on the merits. Shams also should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against *him.* The copyright infringement allegations limn exactly the same transactions and occurrences against both defendants. Shams will not be prejudiced in the Massachusetts Action because he was president of BioDiscovery and thus had immediate knowledge that he was the true party in interest in this action. The nature of the amendment relates to a reasonable mistake by GSLI based on misleading and inaccurate assertions of ownership made by Shams and BioDiscovery and not refuted or clarified by Shams during the course of his direct negotiations with them. All the factors in Rule 15(c)(3) are satisfied on the record before this Court.

Furthermore,

When the named defendant and the party that the plaintiff actually intended to sue have an "identity of interest" an amendment adding the proper party will relate back if the other requirements of Rule 15(c) have been satisfied. Identity of interest generally means that the parties are so closely related in their business operations or other activities that the institution of an action against one serves to provide notice of the litigation to the other.

Charles A. Wright, Arthur R. Miller & Mary Kay Kane, 6A Federal Practice and Procedure: Civil 2d § 1499. Shams cannot say (and has not said) that he had no notice of the original Massachusetts Action.

Thus, this Court holds that GSLI's Massachusetts Action, including Shams as defendant, was filed prior to Shams' California Action. The question remains as to whether there exist other factors justifying dismissal in favor of the California Action.

### 4. Other Factors

Shams' motion to dismiss, now stripped of his assertion that his own claim was first filed, could be interpreted as a request to transfer venue pursuant to 28 U.S.C. § 1404(a), which reads: "For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." "Section 1404(a) is a codification of the doctrine of forum non conveniens." *Albion v. YMCA Camp Letts,* 171 F.3d 1, 2 (1st Cir.1999). Shams has not brought such a motion, but it is implied from the portions of the motion that do not rely on his now-rejected "first-filed" argument.

■ "Where identical actions are proceeding concurrently in two federal courts, entailing duplicative litigation and a waste of judicial resources, the first filed action is generally preferred in a choice-of-venue decision." *Cianbro Corp. v. Curran–Lavoie, Inc.,* 814 F.2d 7, 11 (1st Cir.1987); *see also Nowak v. Tak How Invs., Ltd.,* 94 F.3d 708, 719 (1st Cir.1996) ( [T]here is a "strong presumption in favor of a plaintiff's forum choice, [against which] the defendant must bear the burden of proving ... that considerations of convenience and judicial efficiency strongly favor litigating the claim in the alternative forum."); *Coady v. Ashcraft & Gerel,* 996 F.Supp. 95, 100 (D.Mass.1998) ("There is a strong presumption in favor of the plaintiff's choice of forum."), *rev'd on other grounds, Coady v. Ashcraft & Gerel,* No. 99–2165, 2000 WL 1072386, at *9 (1st Cir. Aug. 8, 2000) ("The burden of proof rests with the party seeking transfer; there is a strong presumption in favor of the plaintiff's choice of forum."). In *Nowak,* the First Circuit quoted the Supreme Court's decision in *Koster v. Lumbermens Mut. Cas. Co.,* 330 U.S. 518, 524, 67 S.Ct. 828, 91 L.Ed. 1067 (1947), for the proposition that a plaintiff should not be deprived of the advantages of his own jurisdiction except upon a clear showing of facts which either "(1) establish

such oppressiveness and vexation to a defendant as to be out of all proportion to plaintiffs convenience, which may be shown to be slight or nonexistent, or (2) make trial in the chosen forum inappropriate because of considerations affecting the court's own administrative or legal problems." *Nowak,* 94 F.3d at 720; *see also Iragorri v. Int'l Elevator, Inc.,* 203 F.3d 8, 15 (1st Cir.2000). Thus, the fact that GSLI filed its suit first ordinarily would preclude a transfer of venue to the court of the second filing.

■ The fact that GSLI's action is for declaratory relief does not bar the application of the first-filed presumption. Nor do Shams' allegations that GSLI filed the action on December 10th but then waited a week to serve process in order to continue negotiations. *See* Def.Mot. at 6. There is no allegation that GSLI made any representations that it would not sue during the intermittent negotiations, the last acknowledged one of which broke off on December 9th. "[Plaintiff's] decision to file but not to serve its suit immediately manifested a desire on its part both to avoid litigation if at all possible and to attempt to secure the convenience of a Massachusetts forum if litigation was required. In these circumstances, it would not be inequitable to have this dispute litigated in Massachusetts." *Biogen, Inc. v. Schering AG,* 954 F.Supp. 391, 397 (D.Mass.1996) (Wolf, J.).

> [T]he general rule favors the forum of the first-filed action, whether or not it is a declaratory action. Exceptions, however, are not rare, and are made when justice or expediency requires, as in any issue of choice of forum.... There must, however, be sound reasons that would make it unjust or inefficient to continue the first-filed action.

*Genentech, Inc. v. Eli Lilly,* 998 F.2d 931, 937–38 (Fed.Cir.1993) (citations omitted), *abrogated on other grounds, Wilton v. Seven Falls Co.,* 515 U.S. 277, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995).

Shams offers a list of factors for this Court to consider in arguing that litigation

in California makes more sense. These factors relate to the domicile of the defendants, the location of employees and witnesses, and the location of corporate offices, among others. *See* Def.Mot. at 15–16. These reasons fall well short of any oppressiveness or vexation that would compel this Court to transfer the action to California. The record shows that GSLI was concerned about damage to its reputation potentially incurred by allegations of copyright infringement that were not grounded in a specific theory nor awaiting judicial scrutiny. Under those circumstances, it is entirely appropriate for GSLI to have brought a declaratory judgment to vindicate its claim of innocence.

### B. *Motion to Dismiss for Lack of Personal Jurisdiction*

■ Shams raises the argument that he is not subject to personal jurisdiction in Massachusetts. The Massachusetts Long Arm statute allows for personal jurisdiction "over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's (a) transacting business in the Commonwealth." Mass.Gen.Laws ch. 223A, § 3(a) (1999). "[A]lthough an isolated (and minor) transaction with a Massachusetts resident may be insufficient, generally the purposeful and successful solicitation of business from residents of the Commonwealth ... will satisfy the transacting any business requirement." *Connecticut Nat'l Bank v. Hoover Treated Wood Prods., Inc.,* 37 Mass.App.Ct. 231, 234, 638 N.E.2d 942 (1994) (Gillerman, J.). "It is clear that anything but the most incidental commercial conduct with a Massachusetts resident is sufficient to satisfy the transacting any business test." *Foster–Miller, Inc. v. Babcock & Wilcox Canada,* 848 F.Supp. 271, 276 (D.Mass.1994) (Stearns, J.), vacated and remanded on other grounds, 46 F.3d 138 (1st Cir.1995).

#### 1. Shams has transacted business in Massachusetts

■ At the outset, this Court holds that Shams' participation in negotiations and

contracting with GSLI is not immune from jurisdictional reach simply because he entered into his legal arrangements under the name "BioDiscovery." Shams tried to have it both ways by arguing to the Court in another part of his motion that he, and not BioDiscovery, is the true owner of the copyright despite ongoing representations by him and his counsel to the contrary during and after the contract negotiations. If BioDiscovery indeed duly entered into agreements relating to the ImaGene software, it must have done so *as an agent of Shams*, who was the real owner and author of the software program. This Court holds, on the record before it for the purposes of these motions, that Shams was a necessary party to the two Agreements between GSLI and BioDiscovery since those Agreements directly implicated his property interests. An agency relationship is evident, and Shams is not immune from jurisdictional reach merely by virtue of his use of agents.

### 2. Claims arising out of the transaction of business

The more troublesome jurisdictional question concerns whether the parties' Agreements (1) allowing confidential inspection of ImaGene or (2) granting non-exclusive distribution rights of ImaGene with GSLI's equipment, can support proper personal jurisdiction in a claim relating to *copyright infringement* of the distributed product.[9] Massachusetts courts have fashioned a "rational nexus" requirement "between the cause of action and the transaction of business in Massachusetts." *Johnson v. Witkowski*, 30 Mass.App.Ct.

697, 713, 573 N.E.2d 513 (1991). Although Shams would be subject to suit under the long-arm statute for claims relating to breach of contract, violation of trade secrets, et cetera, a leap of logic is necessary to find that a matter of copyright infringement[10] "arises out of" or has a "rational nexus" with a contract governing distribution of the copyrighted material. After all, it is not necessary to have a software distribution contract in order to infringe the copyright. One need only be a consumer of the product who either reverse-engineers it or otherwise copies some copyrighted portion thereof.

The Confidentiality Agreement and the OEM/Remarketing Agreement both gave GSLI access to the copyrighted software. Each implicates a differing analysis, however. The OEM/Remarketing Agreement is essentially a non-exclusive distribution agreement. It reflects Shams' engaging in a typical product distribution scheme. The Confidentiality Agreement, however, was something different.[11] It provided to GSLI the right to examine and use the *pre-release version* of ImaGene software for purposes of deciding whether to become a distributor of ImaGene for BioDiscovery/Shams. That kind of agreement carries with it all manner of trust issues and intellectual property issues such as trade secrets and copyright protection. Indeed, the agreement itself included a provision prohibiting copying or modification of the materials except as expressly authorized by BioDiscovery. The agreement provided no internal time limit as to its expiration, save for a clause of termination three years after the return or de-

---

**9.** In his parallel action in California, Shams has indeed alleged violations of the contracts between BioDiscovery and GSLI, but those allegations (which presumably would come into the Massachusetts Action as counterclaims) do not inform an analysis of personal jurisdiction over GSLI's claim, since GSLI has only sought a declaration concerning the *copyright*.

**10.** Or a declaratory judgment action of non-infringement.

**11.** Exactly what was in the Confidentiality Agreement is not clear because the copies attached as exhibits to the pleadings do not contain the "Authorized Use" Attachment B, which informs the analysis of the purposes of the Agreement. The parties seem to agree that its purpose was to test the software for use with GSLI apparatus to determine suitability for bundled sale.

struction of all materials involved. Thus, there is no reason to believe that the Confidentiality Agreement was no longer in effect at the time of the alleged infringement or that it terminated upon the agreement between the parties to enter into an OEM/Remarketing Agreement. (For example, GSLI may still be under a continuing duty not to disclose trade secrets about pre-release version features that did not make it into the release version of Ima-Gene.) As a result, the two contracts should be analyzed separately.

a. The OEM/Remarketing Agreement

■ According to the uncontradicted record before this Court, GSLI took no steps that could be deemed infringement prior to the summer of 1998, because that is when it decided to develop its own (allegedly infringing) software. That was *after* it had entered into the OEM/Remarketing Agreement. The first question is, therefore, whether the alleged copyright infringement can be said to have arisen out of that agreement, which was essentially a distribution agreement.

Courts have held that a declaratory action claim for non-infringement of a copyright or a patent cannot, without more, be said to "arise out of" the commercial distribution of the patented or copyrighted articles within a state. In *Ham v. La Cienega Music Co.*, 4 F.3d 413 (5th Cir.1993), the Fifth Circuit held that personal jurisdiction over the defendant would offend due process in a declaratory judgment non-infringement copyright action. Plaintiff Ham brought a declaratory judgment action for non-infringement of La Cienega's copyrighted song, "Boogie Chillen." Ham based his personal jurisdiction on the fact that La Cienega distributed its copyrighted song in the forum state in an effort to profit from it.

> Ham ... has demonstrated at best a highly attenuated relationship between the subject matter of the instant declaratory judgment action and distribution of music in Texas by La Cienega ... [T]he resolution of this action depends solely upon whether [the plaintiff] infringed copyrights owned by ... La Cienega. Exploitation of the 'Boogie Chillen' copyrights by defendants in no way relates to the merits of that question.

*Id.* at 416.

Similarly, in *Zumbro, Inc. v. California Natural Prods.*, 861 F.Supp. 773 (D.Minn. 1994), the district court addressed the point in a declaratory judgment action for non-infringement and invalidity of a *patent*. The defendant patent owner had engaged in sporadic attempts to develop its business in Minnesota. The cause of action did not arise from those contacts with the state, however.

> Zumbro's claims in Count I neither arise out of nor relate to the activities in which CNP has engaged in order to exploit those patents, including producing and promoting products covered by the patents.... Zumbro claims no injury flowing from CNP's production, marketing, and sale of its products. Accordingly, there does not appear to be any nexus between CNP's marketing and sale of its products in Minnesota and the subject matter of Zumbro's claims in Count I, which concern only the patents' validity and Zumbro's own actions.

*Id.* at 780.

In *Coastal Video Communications, Corp. v. Staywell Corp.*, 59 F.Supp.2d 562 (E.D.Va.1999), Coastal brought suit against Staywell for a declaration that its manual did not infringe the defendant's copyright. The court wrote:

> Plaintiff insists that the activities of defendant with respect to the copyrighted material in Virginia are relevant and suffice to give the court personal jurisdiction over the copyright holder because the instant action is, at root, a copyright infringement action based on defendant's allegations that Coastal obtained and copied "Safety Zone" in Virginia. However, such an argument overlooks the fact that defendant has

made no allegations or claims before the court. Instead, it is Coastal who has attempted to bring Krames before the court in an attempt to obtain a declaration that Coastal's publication does not infringe on Krames's "Safety Zone" copyright. As Krames correctly points out, the declaratory judgment action does not hinge on whether copies of the copyrighted material are sold in Virginia. Instead, it is the existence of the "Safety Zone" copyright that gives rise to plaintiff's declaratory judgment action before this court, or to any infringement action that Krames would have brought against Coastal, had Coastal not preceded Krames to the courthouse. In point of fact, even if Krames had no contact whatsoever with the state of Virginia, Coastal's declaratory judgment action and Krames's potential infringement action would still exist. *Simply put, where defendant sells the copyrighted product is not relevant to the existence of plaintiff's declaratory judgment cause of action on copyright infringement, nor to the question of whether the court has specific, personal jurisdiction over the defendant.*

*Id.* at 566 (emphasis added); *see also Polymers, Inc. v. Ultra Flo Filtration Sys., Inc.,* 33 F.Supp.2d 1008, 1017 (M.D.Fla. 1998) (stating that plaintiff failed to establish that declaratory judgment arises out of defendant's contact with forum state because defendant's "distribution of its own patented goods in Florida is not intimately or sufficiently connected with [plaintiff's] action to obtain a declaration that [plaintiff's] goods do not infringe [defendant's] patents").

In the instant case, the issue of copyright infringement does not arise out of BioDiscovery's (Shams') OEM/Remarketing agreement with GSLI. The copyright non-infringement declaratory action would still be viable even in the absence of the OEM/Remarketing agreement with GSLI. Although there is no controlling case law on point in the First Circuit, and although there seems to be a special situation here where the alleged infringer is also the distribution agent in the forum state, the rationale in the precedents cited above remains persuasive. The distribution agreement can serve to show that GSLI had the *opportunity to copy* the copyrighted work (an important aspect of infringement) but that merely goes to an element of the infringement claim, and does not bear a "rational nexus" to the existence of the copyright infringement itself, which could just as easily have "arisen" from GSLI's purchase of Shams' software anywhere in the world.

b. The Confidentiality Agreement

■ The Confidentiality Agreement provides a stronger basis for personal jurisdiction than the OEM/Remarketing Agreement because it indicates that GSLI was in a position of trust and obliged not to copy or modify the materials to which it had access. *See* Shams Decl.Ex. B ¶ 2. Considering the short period of time between the execution of the Confidentiality Agreement (January 1993) and the OEM/Remarketing Agreement (March 1998), it is reasonable to assume (in the absence of any evidence in the record, of which there is none) that the software GSLI possessed from the start was almost identical to the software it distributed after March 1998. That is to say, GSLI received a pre-release version of *ImaGene* in January 1998 for its evaluation, not a different precursor that was heavily modified to *become* ImaGene. There is no evidence that there were changes made to the ImaGene software after March 1998. Thus, the copyright infringement claim relates to both agreements in the same way. The Confidentiality Agreement was intended to provide the potential distributor (GSLI) with the ability to decide whether to supply the software. It can be viewed as a part of the pre-contractual activities of two companies in a pending distribution arrangement. Viewed from this perspective, there is no reason to believe that an infringement action would "arise from" a

confidentiality agreement any more than it would from a distribution agreement. A breach of the Confidentiality Agreement could be said to "arise from" the alleged copyright infringement, but not vice versa.

That position is underscored by GSLI's narrow complaint, which asks for a declaration that QuantArray does not infringe on any copyright owned by Shams or BioDiscovery, and to enjoin them from alleging any such claims. It does *not* seek declaratory relief that the Confidentiality Agreement is either mooted by virtue of the OEM/Remarketing agreement or a declaration of non-breach of the terms of the Confidentiality Agreement. There is no claim in this action brought by GSLI that actually arises out of the Confidentiality Agreement.[12]

This Court holds that the copyright infringement claim does not arise out of either contractual relationship and therefore those contracts cannot support personal jurisdiction over Shams in this non-infringement declaratory judgment action.

### c. Warning letters and related communications

■ Although personal jurisdiction over Shams is inappropriate in a non-infringement action based upon his contractual contacts with Massachusetts, his warning letter and related communications to GSLI do provide this court with adequate, reasonable grounds for personal jurisdiction.

Although there is some disagreement among the Circuits over the extent to which a letter accusing infringement can be the sole basis for personal jurisdiction, or a basis for jurisdiction when that letter is combined with *other* significant forum activities, the First Circuit has established a framework that allows for personal jurisdiction here. In *Nova Biomedical Corp. v. Moller*, 629 F.2d 190 (1st Cir.1980), the First Circuit had occasion to clarify the doctrine of personal jurisdiction premised upon the sending of a warning letter into the forum state. The court considered whether "the mailing of two letters charging patent infringement and threatening litigation constitutes the 'transacti(on)' of 'business.'" *Id.* at 193. The court agreed with the Eighth Circuit that "[t]he mailing of a letter charging patent infringement and threatening litigation is clearly a 'purposeful' act by the defendant." *Id.* at 195. Rationalizing its conclusion with relation to the Massachusetts Long Arm Statute, the court wrote:

> It is enough here to conclude that the statutory requirement is met (1) where the defendant already is conducting or planning some patent-related business activity in the forum, whether directly, by engaging in the manufacture or sale of products, or indirectly, by receiving royalties from a licensee who is so engaged, and (2) where the plaintiff is pursuing a competing line of work there. In these circumstances, the mailing of a letter that charges infringement and threatens suit can reasonably be considered an attempt "to reduce competition and thereby improve defendant's marketing and economic position." *B & J Mfg. Co. v. Solar Indus., Inc.*, 483 F.2d at 598 [8th Cir.1973]. In fact, given their common source and potential impact on one another, we think it justifiable in this context to view a charge of infringement as an extension or a component of

---

12. Generally, to proceed with a declaratory judgment action for non-infringement, the declaratory judgment plaintiff must show that there is an actual and substantial controversy between the parties. That has been shown here by the communications between GSLI and BioDiscovery relating to copyright infringement. The record shows that BioDiscovery did make mention of a contravention of "written agreements between the parties," but GSLI did not bring an action here for a declaration of non-breach. Arguably, if GSLI had merely included in its Massachusetts Action a cause of action relating to non-breach of the Agreements, personal jurisdiction would attach. The only actual controversy presently before this Court, however, is for copyright infringement, and thus the Massachusetts Action, filed in response to that controversy, relates only to copyright status even though it implicates the contracts.

the defendant's patent-related business activities in the forum particularly where, as here, the patentee and licensee have collaborated closely on the question of the plaintiff's alleged infringement. Under this approach, a mailed notice of infringement in the context described clearly would satisfy the statutory prerequisite.

*Id.* at 195–96.

By this reasoning, Shams' threatening communications to GSLI satisfy the Massachusetts statute, especially in light of his ongoing attempts to exploit his copyright here. It is of no import that the instant case lies in copyright and not patent—the rationale is identical. BioDiscovery's counsel [13] wrote to four officers or managers of GSI Lumonics on October 25, 1999. *See* Lyne Aff.Ex. A. Of these four people, three were in Massachusetts and one was in California. The letter also indicated two verbal communications of the same content made to managers in Massachusetts. *See id.* The letter in no uncertain terms accused GSLI of "intentional and illegal copying and misappropriation" of ImaGene. *Id.* It threatened immediate litigation if contact were not made within two days to discuss the issue. This is precisely the type of letter that, when sent to Massachusetts, will affect the Massachusetts company's competitive position, marketing strategies, and economic posture. It fits squarely within the First Circuit's analysis, thus satisfying the Massachusetts Long Arm statute.

■ In addition to meeting the requirements of the long arm statute, application of personal jurisdiction over Shams must also comport with due process. *See Nova,* 629 F.2d at 197. There is significant doubt that a threatening letter *alone* can satisfy "notions of fair play and substantial justice." The First Circuit provides some additional guidance:

More importantly, we do not hold here nor did the court in *B & J Manufacturing* that "sending threatening infringement letters into the forum district suffices to succumb to that district's jurisdiction." *Cascade Corp. v. Hiab–Foco Ab,* 200 U.S.P.Q. 594, 595, 1977 WL 23190 (D.Or.1977), *aff'd on other grounds,* 619 F.2d 36 (9th Cir.1980) (footnote omitted) (description of B & J holding). What we do hold is that such conduct can, in certain circumstances, constitute the transaction of business within the meaning of the Massachusetts long arm statute. Whether a patentee is thereafter subject to jurisdiction will depend on whether he possesses sufficient contacts with the forum to satisfy due process. While it is unnecessary for us to reach the question in light of Moller's extensive contacts with Massachusetts ... we note that the mailing of an infringement notice standing alone has rarely been deemed sufficient to satisfy the constitutional standard.

*Nova,* 629 F.2d at 197.

According to *Nova,* this Court must find that Shams had contacts with Massachusetts other than the threatening letter in order to use the letter as a constitutional basis for personal jurisdiction. In making its determination that Moller had extensive contacts with Massachusetts sufficient to satisfy due process concerns, the First Circuit took notice of his entering into a licensing agreement relating to his patent. The facts in *Nova* are similar to the instant case, and are worth noting. The court wrote:

By entering into the licensing agreement with Orion and visiting Massachusetts twice on related business, Moller has "purposefully avail[ed][him]self of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws."

---

13. Once again, this Court finds an agency relationship over Shams' rights since this letter purports to defend the interest of the copyright holder.

*Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283[ ] (1958). We thus think it apparent that "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court [here]." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490[ ] (1980). Certainly, if a dispute arose over the licensing agreement, Orion could gain jurisdiction over Moller in a Massachusetts court consistently with due process.

Other factors relevant to the constitutional inquiry, *see, e.g., id.* at 4081; *Whittaker Corp. v. United Aircraft Corp.,* 482 F.2d 1079, 1083 (1st Cir.1973), reinforce the propriety of asserting jurisdiction in the present case. First, Massachusetts has an undeniable interest in providing a forum for residents accused of patent infringement. *See generally Carlson Corp. v. University of Vermont,* 80 Mass.Adv.Sh. 659, 380 Mass. 102, 402 N.E.2d 483, 487 (1980). Second, considerations of convenience to the parties, as manifested by the applicable venue statutes, militate in favor of jurisdiction here; Massachusetts is both a permissible forum for suit against Moller, 28 U.S.C. § 1391(d) (1970), and a necessary forum for any patent infringement action against Nova, 28 U.S.C. § 1400(b) (1970).

. . .

Finally, whether or not Nova's suit can be said to "arise from" Moller's principal contacts with the forum, the two are connected at least in the sense that they involve the same patent. In any event, the fact that a controversy is unrelated to the defendant's activity in the forum is not necessarily fatal to the existence of jurisdiction there, so long as its forum-related business is substantial. *Compare Perkins v. Benguet Consol. Min. Co.,* 342 U.S. 437, 446–47, 72 S.Ct. 413, 418–419, 96 L.Ed. 485 (1952), *and Garcia Pujol v. United States Life Ins. Co.,* 396 F.2d 430, 431–32 (1st Cir.1968),

*with Cruz v. Ortho Pharmaceutical Corp.,* 619 F.2d at 906 (1st Cir.1980). *Id.* at 193 n. 3.

The First Circuit's guidance is very helpful here. Shams indisputably was engaged in significant licensing and distribution agreements in Massachusetts relating directly to the copyrighted software. He could reasonably anticipate being haled into court here on any claim relating directly to his contracts with GSLI. It would therefore not be unfair to require him to litigate a very closely related claim involving his very own distributor who distributes both his software and allegedly infringing software. In the threat letter sent to GSLI, Shams even blends his accusations of copyright infringement with accusations of violating agreements between the parties. To Shams, the action is very closely related to the dealings between the parties. This is exactly the type of situation, envisioned by the First Circuit in *Nova,* in which the imposition of personal jurisdiction in Massachusetts does not offend due process considerations.

This Court acknowledges its own relevant opinions in *Polaroid Corp. v. Feely,* 889 F.Supp. 21 (D.Mass.1995) and *JMTR Enter. L.L.C. v. Duchin,* 42 F.Supp.2d 87 (D.Mass.1999). In *Polaroid,* this Court ruled, as here, that a threatening letter sent into Massachusetts was sufficient to satisfy the Massachusetts Long Arm statute. This Court then held, however, that there was a lack of personal jurisdiction for want of due process because the defendant's only contact with Massachusetts other than the letter was an advertisement in a national trade magazine. Such advertising specifically had been held by Massachusetts courts not to satisfy the requirements of due process in the context of personal jurisdiction. *See Polaroid,* 889 F.Supp. at 27. In the instant case, Shams has conducted extensive and direct business activities with a company in this forum in an attempt to exploit his copyrighted software here. *Polaroid* is thus distinguishable.

In *JMTR*, this court again recognize the First Circuit's ruling in *Nova* that a single letter sent to Massachusetts can satisfy the requirements of the long arm statute. *See JMTR*, 42 F.Supp.2d at 95–96. This Court then held that personal jurisdiction was proper over a defendant who had sent many business letters into Massachusetts and arranged for her attorney to meet with the plaintiffs in Boston. *See id.* at 98. *JMTR* is consistent with the Court's opinion herein. Shams is properly subject to personal jurisdiction in Massachusetts. Shams is subject to personal jurisdiction in Massachusetts because his threatening letter was coupled with prior commercial exploitation, in Massachusetts, of the very same product that the letter attempted to protect.

## IV. CONCLUSION

For the foregoing reasons, by Order of March 6, 2000, this Court DENIED the Defendants' motion to dismiss with respect to defendant Shams and GRANTED the Defendants' motion to dismiss with respect to defendant BioDiscovery, Inc.